IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge R. Brooke Jackson

Civil Action No. 15-cv-02563-RBJ

GREGORY D. SMITH,

    Plaintiff,

v.

CAROLYN W. COLVIN, Commissioner of Social Security,

    Defendant.

# ORDER

This matter is before the Court on review of the Commissioner's decision denying claimant Gregory D. Smith's application for Disability Insurance Benefits and Supplemental Security Income under Title II and Title XVI of the Social Security Act. Jurisdiction is proper under 42 U.S.C. § 405(g). For the reasons explained below, the Court affirms the Commissioner's decision.

    **I.**   **Standard of Review.**

This appeal is based upon the administrative record and the parties' briefs. In reviewing a final decision by the Commissioner, the role of the District Court is to examine the record and determine whether it "contains substantial evidence to support the [Commissioner's] decision and whether the [Commissioner] applied the correct legal standards." *Rickets v. Apfel*, 16 F. Supp. 2d 1280, 1287 (D. Colo. 1998). A decision is not based on substantial evidence if it is

"overwhelmed by other evidence in the record." *Bernal v. Bowen*, 851 F.2d 297, 299 (10th Cir. 1988). Substantial evidence requires "more than a scintilla, but less than a preponderance." *Wall v. Astrue*, 561 F.3d 1048, 1052 (10th Cir. 2009). Evidence is not substantial if it "constitutes mere conclusion." *Musgrave v. Sullivan*, 966 F.2d 1371, 1374 (10th Cir. 1992). Regarding the application of law, "reversal may be appropriate when the [Social Security Administration] Commissioner either applies an incorrect legal standard or fails to demonstrate reliance on the correct legal standards." *Springer v. Astrue*, No. 11-cv-02606, 2013 WL 491923, at *5 (D. Colo. Feb. 7, 2013).

## II. Background.

Mr. Smith was born in 1989 and is now 27 years old. *See* R. 205. He has suffered from anxiety disorders for his entire life. R. 250. He was enrolled in special education classes in high school and graduated in 2008. R. 237. After graduation he worked short stints as a janitor, as a laborer, and in several other lines of work. R. 222–23, 238.

Mr. Smith has not been able to hold a job because of the social demands he has faced at work, which trigger his severe social anxiety. R. 77. In 2009, for instance, he was employed as a janitor until he was required to work with a team of people on an intensive cleaning project. R. 85. He quit shortly thereafter. *Id.* In 2010, Mr. Smith worked for roughly six months at a car wash until his manager insisted that he change positions and deal with customers. R. 86. He got in an argument with his boss and quit. R. 87. Later that year he got a job working on an assembly line and, after a bumpy start, was placed in a role where he would not have to interact with other people while he worked. R. 88. He left that job after about six months, however, when his family moved to Colorado. *Id.* He has not worked much since this move. R. 219–21.

### A. Procedural History.

On April 18, 2013 Mr. Smith applied for Disability Insurance Benefits based on his own earnings, Child's Insurance Benefits based on his father's earnings, and Supplemental Security Income, alleging disability beginning April 1, 2009. R. 205, 209, 215. The claims were initially denied on July 2, 2013. R. 145, 149. Mr. Smith requested a hearing, which was held in front of Administrative Law Judge (ALJ) John A. Beall on July 29, 2014. R. 66. The ALJ issued a decision denying benefits on September 2, 2014. R. 48. The Appeals Council denied Mr. Smith's request for review on September 20, 2015, rendering the ALJ's determination the final decision of the Commissioner for purposes of judicial review. R. 1. Mr. Smith filed a timely appeal in this Court.

### B. The ALJ's Decision.

The ALJ issued an unfavorable opinion after evaluating the evidence according to the Social Security Administration's standard five-step process. R. 51–64. First, he found that Mr. Smith had not engaged in substantial gainful activity since his alleged onset date of April 1, 2009. R. 53. At step two, the ALJ found that Mr. Smith had the severe impairments of obesity, bipolar disorder, attention deficit hyperactivity disorder, panic disorder with agoraphobia, social phobia, and developmental learning disorder. R. 54. At step three, the ALJ concluded that Mr. Smith did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. R. 54–57.

The ALJ then found that Mr. Smith retained the residual functional capacity (RFC) to perform a full range of work at all exertional levels but with nonexertional limitations restricting

him to jobs that require: unskilled work; only simple job-related decisionmaking and few workplace changes; at most brief, superficial interactions with the general public for no more than 10% of his workday; at most occasional interaction with coworkers and supervisors; no independent travel, travel to unfamiliar locations, or use of public transportation; no concentrated exposure to workplace hazards; no operation of a motor vehicle; and no fast-paced or production-line work. R. 57–62. At step four, the ALJ concluded that Mr. Smith had no past relevant work. R. 62. Finally, at step five, the ALJ determined that there were jobs that existed in significant numbers in the national economy that Mr. Smith could perform. R. 62–63. Therefore, the ALJ concluded that Mr. Smith was not disabled. R. 63–64.

### III. <u>Discussion</u>.

Mr. Smith contends that the ALJ made numerous errors at step four in the RFC determination and at step five in developing the vocational expert's testimony. Specifically, Mr. Smith argues that the ALJ improperly: (1) adopted some, but not all, of Dr. Madsen's opinions; (2) misused Mr. Smith's Global Assessment of Functioning (GAF) scores; (3) failed to address all of Dr. Wanstrath's findings; (4) disregarded Ms. Gilbert's and Dr. Abdullah's opinions; (5) gave Mr. Shaffner's opinion about Mr. Smith's RFC no weight; (6) applied the wrong standard of disability; (7) made questionable credibility findings; and (8) failed to ask the vocational expert a hypothetical question that accounted for all of Mr. Smith's symptoms. The Court will consider each argument in turn.

### A. Step Four.

#### 1. Dr. Madsen.

Mr. Smith begins his litany of claims by arguing that the ALJ ignored Dr. Madsen's description of Mr. Smith's symptoms and the doctor's conclusion that these symptoms "significantly interfere with his ability to work." ECF No. 17 at 21–22. As he points out, "[t]he ALJ is not entitled to pick and choose from a medical opinion, using only those parts that are favorable to a finding of nondisability." *Robinson v. Barnhart*, 366 F.3d 1078, 1083 (10th Cir. 2004). Later on Mr. Smith restates this same basic argument under a different heading, claiming that because the RFC assessment ignores Dr. Madsen's opinion, the ALJ had to explain why the opinion was not adopted. ECF No. 17 at 23 (citing Social Security Ruling (SSR) 96-8p, 1996 WL 374184, at *7 (July 2, 1996)). Mr. Smith tenaciously advances this argument again a third time, rewording his claim to assert that the ALJ "failed to discuss significantly probative evidence he rejects." *Id.* (quoting *Clifton v. Chater*, 79 F.3d 1007, 1010 (10th Cir. 1996)) (internal quotation marks omitted).

These arguments are unavailing. The ALJ adopted Dr. Madsen's findings to the degree that they are consistent with the record as a whole and adequately explained why he did not take certain reports at face value. *See* R. 57, 61. In particular, the ALJ accounted for Dr. Madsen's medical findings in his step-two conclusion that Mr. Smith suffers from "panic disorder with agoraphobia," "social phobia," and bipolar disorder. *Compare* R. 54, *with* R. 357. The step-four RFC assessment adopts nonexertional limitations on Mr. Smith's travel requirements for his agoraphobia and interactions with the other people for his social phobia. R. 57. However, the ALJ found reports of debilitating manic and depressive periods immaterial due to Mr. Smith's

work history after his alleged onset date without interference from these spells. R. 61. Dr. Madsen's conclusion that Mr. Smith's symptoms "significantly interfere with his ability to work" is not entitled to deference because "the ALJ, not a physician, is charged with determining a claimant's RFC from the medical record." R. 357; *Howard v. Barnhart*, 379 F.3d 945, 949 (10th Cir. 2004). Nevertheless, this conclusion is reflected in the RFC's nonexertional limitations. *See* R. 57, 59.

### 2. GAF scores.

Next, Mr. Smith takes issue with the ALJ's treatment of his GAF scores. He appears to argue that no weight should be given to Dr. Madsen's finding that he had a GAF score of 60, which represents mild-to-moderate symptoms. ECF No. 17 at 22. He cites *Harper v. Colvin* as saying that a GAF score "is not essential to the RFC's accuracy." *Id.* (citing 528 F. App'x 887, 891 (10th Cir. 2013) (unpublished)). This much is true. But the question is whether the ALJ *may* consider a GAF score, not whether he *must*. Mr. Smith's citation concedes that the ALJ may use this GAF score, acknowledging that "a GAF score may be of considerable help to the ALJ in formulating the RFC." *Harper*, 528 F. App'x at 891.

In the same discussion, Mr. Smith cites the unpublished opinion in *Petree v. Astrue* for the proposition that "a low GAF score does not alone determine disability, but is instead a piece of evidence to be considered with the rest of the record." ECF No. 17 at 23 (quoting 260 F. App'x 33, 42 (10th Cir. 2007) (unpublished)). This quotation is irrelevant. The ALJ did consider Mr. Smith's GAF score as only one piece of evidence in the record. *See, e.g.*, R. 59 ("Dr. Wanstrath concluded that . . . . the claimant can accept supervision and relate to coworkers and the public, if the contact is not frequent."); R. 60 ("Mr. Shaffner's notes reflect the fact that

the claimant held a job in Cedar Rapids, Iowa, where the claimant was making progress at work . . . ."); R. 61 ("The record reflected no objective evidence of a worsening as reflected by his work history, when the claimant's functioning is mirrored against his pre-disability activities.").

Additionally, Mr. Smith argues that there was a discrepancy between Dr. Madsen's findings of Mr. Smith's symptoms and GAF score, requiring the ALJ to further develop the record. ECF No. 17 at 23 (citing 20 C.F.R. § 404.1519p(b)). But Mr. Smith identifies no inconsistency, and the Court sees none. Instead, as Mr. Smith's brief acknowledges, "the GAF score is not linked to any particular symptoms at all." *Harper*, 528 F. App'x at 891.

Mr. Smith also claims that Dr. Madsen's GAF score assignment is the only part of his opinion that is consistent with Dr. Wanstrath's opinion. ECF No. 17 at 24. Again, however, he does not give any indication of how they might be incompatible. *See id*. Instead, the two opinions appear to be compatible. *Compare* R. 59 ("Dr. Wanstrath concluded that the claimant . . . . could not work closely with supervisors, coworkers or the general public on a frequent basis."), *with id.* ("Dr. Madsen concluded that the claimant was suffering from social anxiety that significantly interferes with his ability to work."); *compare* R. 119 (noting "[symptoms] of anxiety disorder with agoraphobia" in Dr. Wanstrath's opinion), *with* R. 357 (writing that Mr. Smith "spends most of his time at home" in Dr. Madsen's opinion).

Last, Mr. Smith claims that the ALJ ignored the August 2013 finding that Mr. Smith had a GAF score of 45. However, the ALJ expressly addressed this finding and explained that he gave it no weight because the GAF score of 60 from the same time period was more consistent with the record as a whole. *See* R. 61. Mr. Smith may have been confused by the ALJ's misstating the name of the person who administered this GAF test; this was someone at

AspenPointe, not Mr. Shaffner. *See* R. 464. But, "[w]here . . . we can follow the adjudicator's reasoning in conducting our review," inconsequential typos "do not dictate reversal." *Keyes-Zachary v. Astrue*, 695 F.3d 1156, 1166 (10th Cir. 2012).

### 3. Dr. Wanstrath.

Mr. Smith claims that Dr. Wanstrath's mental RFC assessment (MRFCA) did not address two of the moderate psychological limitations he had identified. ECF No. 17 at 24–25. In an unpublished opinion, the Tenth Circuit held that

> if a consultant's Section III narrative fails to describe the effect that each of the Section I moderate limitations would have on the claimant's ability, or if it contradicts limitations marked in Section I, the MRFCA cannot properly be considered part of the substantial evidence supporting an ALJ's RFC finding.

*Carver v. Colvin*, 600 F. App'x 616, 619 (10th Cir. 2015) (unpublished). The Court does not find this standard to be so stringent as to undermine the ALJ's decision in this case.

Dr. Wanstrath's summary conclusions about Mr. Smith's capacity for sustained concentration and persistence indicate that he has moderate limitations in: 1) "The ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances," and 2) "The ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods." R. 131–32. The doctor's narrative explanations provide in relevant parts that the "[consultative examination] notes adequate persistence and pace" and "[c]laimant can . . . sustain ordinary routines." R. 132.

In the Court's view, these brief explanations sufficiently describe the effects of Mr. Smith's moderate mental limitations. These limitations both fall under the umbrella of "persistence" restrictions. It is significant that after considering these specific limitations, Dr.

Wanstrath nonetheless noted that Mr. Smith's consultative examination reflected adequate persistence and pace. *See* R. 131–32. Mr. Smith contends that these limitations warranted more discussion since he "lost a job because he couldn't work fast enough." ECF No. 17 at 25. But in the context of an MRFCA narrative—which elaborates on twenty distinct mental limitations—Dr. Wanstrath's succinct observation that Mr. Smith's persistence overall was "adequate" sufficed to describe the insignificance of these moderate limitations. Moreover, the conclusion that Mr. Smith "can . . . sustain ordinary routines" makes clear Dr. Wanstrath's belief that the limitations in Mr. Smith's ability to adhere to a schedule and complete work without interruption do not compromise his residual functional capacity.

Although Dr. Wanstrath certainly could have elaborated on Mr. Smith's limitations in greater detail, this Court does not sit in judgment of the doctor's editorial decisions. As the Tenth Circuit wrote about a similar issue: "The more comprehensive the . . . explanation, the easier our task; but we cannot insist on technical perfection." *Keyes-Zachary*, 695 F.3d at 1166. Instead, the question for this Court is simply whether Dr. Wanstrath's narrative altogether "fails to describe" the effects of Mr. Smith's moderate limitations or "contradicts" those limitations. *Carver*, 600 F. App'x at 619. I conclude that the MRFCA clears this low bar.

Additionally, Mr. Smith claims that Dr. Wanstrath's narrative saying that Mr. Smith "works best in isolated environment[s]" conflicted with his conclusion that Mr. Smith "can accept supervision and relate to coworkers and the public if contact is not frequent or prolonged." ECF No. 17 at 25 (citing R. 132–33). That is incorrect. Dr. Wanstrath's first comment concerns the *optimal* work environment for Mr. Smith, while his second comment

concerns the *minimum* conditions Mr. Smith can tolerate.  These statements speak to different topics and do not conflict.

### 4. Ms. Gilbert and Dr. Abdullah.

Mr. Smith asserts that the Appeals Council erred in disregarding Ms. Gilbert's January 5, 2015 letter and Dr. Abdullah's March 17, 2015 opinion, which were submitted after the ALJ rendered his decision on September 2, 2014.  "[T]he Appeals Council must consider additional evidence offered on administrative review—after which it becomes a part of our record on judicial review—if it is (1) new, (2) material, and (3) related to the period on or before the date of the ALJ's decision."  *Krauser v. Astrue*, 638 F.3d 1324, 1328 (10th Cir. 2011).  The Appeals Council rejected these submissions on the grounds that they relate to a time after the ALJ's decision.  R. 2.  The Court sees no error here.

First, Mr. Smith mentions Ms. Gilbert's letter in his brief without citing to the record or attaching the letter as an exhibit in this appeal.  *See* ECF No. 17 at 25.  The Court has searched the record but cannot find this document, presumably because the Appeals Council rejected the submission and declined to add it to the record.  As a result, Mr. Smith has failed to raise this issue in a way that would enable the Court to review his claim.  And even if the Court could review Ms. Gilbert's letter, it is not clear that this would do Mr. Smith any good.  Mr. Smith claims only that the letter "assign[s] Smith as a 'person with most significant disabilities.'"  *Id.*  This opinion is irrelevant unless it concerns Mr. Smith's condition up to September 2, 2014, which Mr. Smith does not allege.  Thus, Mr. Smith has failed to state a plausible claim.

Second, Dr. Abdullah's "opinion" on March 17, 2015 does appear in the record, but it consists of just two marked checkboxes on a Colorado Department of Human Services Med-9

Form. *See* R. 40–41. The filled-in checkboxes indicate: "I find this individual has been *or will be* totally and permanently disabled to the extent they are unable to work full time at any job due to a physical or mental impairment. This disability is expected to last 12 months or more." R. 40 (emphasis added). By its own terms, Dr. Abdullah's opinion does not unambiguously relate to the period leading up to the ALJ's decision on September 2, 2014. The Appeals Council was therefore right to reject this submission.

### 5. Mr. Shaffner.

Mr. Smith next argues that the ALJ erred in considering Mr. Shaffner's opinion only as it relates to the severity of Mr. Smith's impairments and their effects without giving weight to Mr. Shaffner's RFC opinion. ECF No. 17 at 25–26. There is no mistake here either.

Medical sources include licensed physicians, psychologists, and similar practitioners. 20 C.F.R. §§ 404.1513(a), (d)(1), 416.913(a), (d)(1). When assessing a claimant's RFC, an ALJ must "consider any statements about what [the claimant] can still do that have been provided by medical sources." *Id.* §§ 404.1545(a)(3), 416.945(a)(3). In other words, an ALJ must "consider opinions from medical sources on . . . [a claimant's] residual functional capacity." *Id.* §§ 404.1527(d)(2), 416.927(d)(2). In contrast, an ALJ is required only to "consider descriptions and observations of [the claimant's] limitations from [his] impairment(s) . . . provided by [the claimant], [the claimant's] family, neighbors, friends, or other persons." *Id.* §§ 404.1545(a)(3), 416.945(a)(3).

Mr. Shaffner is social worker. *See* R. 427. Social workers are not medical sources. SSR 06-03p, 2006 WL 2329939, at *5 (Aug. 9, 2006). Therefore, the ALJ was required only to consider Mr. Shaffner's descriptions of Mr. Smith's limitations. Still, the ALJ did give some

11

weight to the findings underlying Mr. Shaffner's RFC opinion. R. 59. But the ALJ found Mr. Shaffner's opinions about the severity and effects of Mr. Smith's impairments to be largely inconsistent with the opinions of Dr. Madsen and Dr. Wanstrath, both of whom are acceptable medical sources who assessed Mr. Smith during the same period as Mr. Shaffner. R. 60. As a result, the ALJ adequately considered Mr. Shaffner's opinions and explained his reasons for not giving them more weight.

### 6. Disability standard.

Mr. Smith claims that the ALJ's use of the words "totally debilitated" indicate that he used the wrong legal standard in determining that Mr. Smith is not disabled. ECF No. 17 at 26. This view misreads the ALJ's decision.

The ALJ's RFC discussion makes clear that he rejects "*the claimant's contention* that he is totally debilitated." R. 62 (emphasis added). The ALJ thus used this language in characterizing Mr. Smith's claims, not in evaluating whether Mr. Smith was disabled under sections 216(i), 223(d), and 1614(a)(3)(A) of the Social Security Act. Indeed, the ALJ's decision expressly defined Mr. Smith's RFC as "his ability to do physical and mental work activities on a sustained basis despite limitations from his impairments." R. 53. There is no sign that the ALJ forgot this definition when he later found that Mr. Smith has the RFC to perform a full range of work at all exertional levels subject to several nonexertional limitations. R. 57. The ALJ's nondisability finding was therefore properly based on an RFC determination rather than a finding that Mr. Smith merely was not "totally debilitated."

### 7. Credibility determinations.

Mr. Smith also criticizes several of the ALJ's credibility determinations. These challenges are hard to win. As the Tenth Circuit has explained:

> The ALJ enjoys an institutional advantage in making the type of determination at issue here. Not only does an ALJ see far more social security cases than do appellate judges, he or she is uniquely able to observe the demeanor and gauge the physical abilities of the claimant in a direct and unmediated fashion. As a result, the ALJ's credibility findings warrant particular deference.

*White v. Barnhart*, 287 F.3d 903, 910 (10th Cir. 2001). Consequently, this Court "will not upset such determinations when supported by substantial evidence." *Kepler v. Chater*, 68 F.3d 387, 391 (10th Cir. 1995) (internal quotation marks omitted). I decline to upset those findings here.

First, Mr. Smith objects to the ALJ's giving his mother's statements only "some weight," "which doesn't explain how much of her depiction of the claimant's anxiety, agoraphobia and mood disorder was credible." ECF No. 17 at 29. There is no mystery here. The ALJ's RFC determination accepts some of the restrictions Mr. Smith's mother noted as nonexertional limitations but discounts her testimony to the extent that it is inconsistent with and outweighed by other evidence in the record. *See* R. 57, 61–62. An ALJ is not required to itemize and spell out exactly how truthful he finds every single statement in determining the credibility of an individual's testimony. Again, "[t]he more comprehensive the ALJ's explanation, the easier our task; but we cannot insist on technical perfection." *Keyes-Zachary*, 695 F.3d at 1166.

Mr. Smith also argues that the ALJ inappropriately discounted his mother's testimony based on his work history through 2011 because his mental capacity deteriorated after their October 2011 move to Colorado. However, his mother's testimony did not mention any effect

this move had on Mr. Smith. *See* R. 96–100, 309–10. Instead, the testimony focused on his alleged onset date in 2009. *See* R. 97–98 (stating that Mr. Smith hit himself after getting in an argument with his father in the summer of 2009, and that he continues to hit himself when he gets frustrated or anxious); R. 99 (saying that Mr. Smith has had manic and depressive periods since 2009); R. 100 (testifying that Mr. Smith was breaking down crying on a daily basis in 2009); R. 309–10 (stating that Mr. Smith's anxiety has been severe and his ability to concentrate, complete tasks, and follow simple instructions have been poor since 2009). This testimony was therefore properly impeached by evidence in the record beginning in 2009.

Moreover, Mr. Smith claims that the ALJ erroneously relied on medical records showing his condition improving with medication when "Dr. Veselka noted that his nervousness, sweaty palms and mild chest pain indicated that general anxiety was not ideally controlled." ECF No. 17 at 29. These two pieces of evidence are not incompatible. Mr. Smith's condition was improving, but had not fully improved. That is exactly what the ALJ's decision says: "[H]is medical records suggest that he has made good improvement with medication. Some medications were even reduced in dosage or eliminated completely by Dr. Cohen, following improvement. The claimant still has some significant difficulty with panic attacks and social phobia, which the above RFC accommodates." R. 61 (citations omitted).

Next, Mr. Smith argues that the ALJ improperly "magnified" Ms. Hoskins' note that Mr. Smith "is seeking permanent disability vs. hoping for resolution of symptoms which is entirely possible." ECF No. 17 at 29 (quoting R. 405, 410). But this Court's limited review serves to ensure only that "the ALJ followed the 'specific rules of law that must be followed in weighing particular types of evidence in disability cases.'" *Hackett v. Barnhart*, 395 F.3d 1168, 1172

14

(10th Cir. 2005) (quoting *Reyes v. Bowen*, 845 F.2d 242, 244 (10th Cir. 1988)).  The Court "will not reweigh the evidence" to shrink the significance of Ms. Hoskins' statement in evaluating Mr. Smith's claims.  *See id.*

Mr. Smith then attacks the ALJ's interpretation of Ms. Hoskins' note as undermining Mr. Smith's credibility, arguing her belief that he was not "hoping for resolution of symptoms" does not mean that he was not seeking such a resolution.  ECF No. 17 at 30.  Mr. Smith also contends that his treatment notes do not reveal a resolution of his symptoms "and there is no indication that he wasn't averse to one."  *Id.*  These assertions are beside the point.  The key language in Ms. Hoskin's statement is "resolution of symptoms . . . is entirely possible."  R. 405, 410.  As the ALJ's decision makes clear, he cited Ms. Hoskins' opinion as evidence that "[t]he claimant's Aspen Pointe treatment provider believes that the claimant is also capable of a resolution of his social phobia symptoms."  R. 61.  The ALJ then explained that he took note of the nurse's "perception of the claimant's possibilities" because "that perception relates to the claimant's credibility" in pursuing disability benefits.  *Id.*  Ms. Hoskins' statement stands as evidence that could be put to this use.

Additionally, Mr. Smith argues that the ALJ "pick[ed] and [chose] among medical reports" in observing that Mr. Smith "has exaggerated his symptoms in the past."  ECF No. 17 at 30; R. 61 (citing R. 337).  There is no error here.  The rule against picking and choosing from medical reports forbids "using portions of evidence favorable to [the ALJ's] position while ignoring other evidence."  *Hardman v. Barnhart*, 362 F.3d 676, 681 (10th Cir. 2004).  The ALJ did not, for example, ignore such evidence by falsely stating that Mr. Smith always exaggerated his symptoms.  Instead, the ALJ merely noted that Mr. Smith has exaggerated his symptoms

15

before. That is accurate. The ALJ reasonably considered this fact in assessing Mr. Smith's credibility.

Furthermore, Mr. Smith claims that the ALJ should have developed the record to determine when his marijuana use started rather than fault him for testifying in July 2014 that he used the drug "a couple times a month" when he denied doing so in June and December 2013, since it is possible that his drug use started in 2014. ECF No. 17 at 30 (citing R. 9, 82, 355). If Mr. Smith truly started using marijuana only a few months before his July 2014 hearing, he had an odd way of saying so. The ALJ asked Mr. Smith directly how often he had "smoked or used marijuana since 2009," and Mr. Smith replied: "Not very often, like once—a couple times a month maybe." R. 82. It is hard to read this statement to mean that Mr. Smith did not use marijuana in 2009, 2010, 2011, 2012, or 2013, but suddenly started using the drug a couple times per month in the first half of 2014. Accordingly, the ALJ was entitled to consider this apparent inconsistency in evaluating Mr. Smith's credibility.

In addition to these valid factors, the ALJ's credibility findings considered many other pieces of evidence, including: the fact that Mr. Smith successfully completed high school in 2008; the lack of any treatment evidence corresponding with Mr. Smith's alleged onset date in 2009; the absence of objective evidence showing Mr. Smith's symptoms worsening after his alleged onset date; and Mr. Smith's wage earnings increasing in 2009, doubling in 2010, and then returning to 2009 levels in 2011, all of which occurred after his alleged onset date. R. 58–

62. Mr. Smith does not dispute these findings. The ALJ's credibility determinations were thus supported by substantial evidence.[1]

### B. Step Five.

In his final argument, Mr. Smith contends that because of the ALJ's purported step-four errors, the ALJ improperly relied on the vocational expert's response to a hypothetical question that did not account for all of Mr. Smith's limitations. ECF No. 17 at 32. But the Court has not found any step-four errors. Therefore, the ALJ's step-five analysis was adequate.

### ORDER

For the reasons described above, the Court AFFIRMS the Commissioner's decision denying claimant Gregory D. Smith's application for Disability Insurance Benefits and Supplemental Security Income.

DATED this 1st day of December, 2016.

BY THE COURT:

_____
R. Brooke Jackson
United States District Judge

---

[1] Inexplicably, Mr. Smith also raises in this section the boilerplate argument that his "daily activities did not reflect regular work full-time in the competitive marketplace." ECF No. 17 at 31. No one has claimed that they do. Mr. Smith's citation to the record refers to the ALJ's proper assessment of Mr. Smith's activities of daily living as part of the step-three analysis of his impairments' severity. *See* R. 55. The step-four RFC assessment does not mention Mr. Smith's activities of daily living at all. *See* R. 57–62.